Case No. 22-1209, Norfolk Southern Railway Company Petitioner v. Circuit Transportation Board, United States of America Mr. Dworsky for the Petitioner, Ms. Wilson for the Respondents, Mr. Hatch for the Intervener, CSX Transportation, Inc. Counsel, good morning. Good morning, Your Honors. May it please the Court. I'm Rashai Dworsky on behalf of Norfolk Southern. If I could reserve three minutes for rebuttal. Norfolk Southern and CSX have long agreed that Norfolk Southern had the ability to control Beltline's board as its majority shareholder. Therefore, in 1991 and 1998, when Norfolk Southern sought approval of corporate family exemptions, it satisfied the requirements of the corporate family regulation because those transactions didn't result in adverse changes in service levels, significant operational changes, or changes in the competitive balance. In its decision below, the STB disagreed and read an additional extra-textual prior authorization requirement into the corporate family regulation. That was arbitrary and capricious, and the Court should vacate and remand. Before we get into the merits, why do we have jurisdiction? Hasn't the District Court in Virginia ruled essentially in your favor? What relief can we give you at this point that matters? What injury would we be redressing? The District Court has ruled in our favor. However, that may well be appealed. The deadline for the notice of appeal has not yet run. That may well be appealed to the Fourth Circuit. Depending on what the Fourth Circuit does, there could at that point be a further live issue in the District Court. At that point, we would be able to avail ourselves of an immunity defense if this Court were to vacate and remand the STB's determination as to the 1991 and 1998 exemptions. Then why shouldn't we just hold this in abeyance and see what happens in the Fourth Circuit? There may not even be a notice of appeal filed. If not, then what jurisdiction do we have? I think the Court would have discretion if it wishes to control the timing of its decision, however it wishes. But the STB's determination is one that could have further effects for the remainder of this litigation. But just to make sure we're all on the same page, it sounds like you're saying if there's no appeal, you think we don't have jurisdiction. And if there is an appeal and the appeal affirms the District Court, then in that event, if our case is not yet decided, we would have no jurisdiction. I think there's jurisdiction regardless, even apart from the decision below. The STB's declaratory ruling in this case went beyond the question that the District Court referred and potentially could have broader implications for the parties in other cases or for their ongoing dealings, apart from the underlying antitrust suit that led to this particular referral. Let's imagine a scenario where the Fourth Circuit affirms the District Court and we have not yet decided this case. What would your injury be that would give you standing in this case? I think at that point, the injury would be that the STB has determined, we believe incorrectly, that we did not have authorization through the 91 and 98 transactions in order to exercise control over Beltline. That could potentially have collateral consequences that go beyond this particular case. What consequences? What injury? I mean, just having a decision that didn't go the way you wanted, I don't see how that's injury. There has to be some impact or ramification from that decision that injures you. Well, I think the injury would be that we believe that we do have authorization in order to exercise control over Beltline. If it is determined that we do not, that could potentially have collateral consequences, either before the STB or in other potential follow-on litigation that could be brought. But regardless, if the Court believes that it would be more prudent to hold this case pending the outcome of the Fourth Circuit litigation, assuming a notice of appeal is filed there, we certainly have no objection to that. I'm trying to figure out what we do after that. We hold it in abeyance. The Fourth Circuit, let's say they affirm the district court, and you've said, well, you might still have been injured because of some type of collateral effects of the STB order. And it sounds pretty speculative. I'm not saying it's too speculative for you to have standing, but it sounds pretty speculative. I would certainly agree with you that the most concrete consequence of the STB's determination is for this pending litigation. And so, again, if the Court has doubts about the consequences, about whether this has any significant consequence, we would have, as I say, no objection to waiting to see at least what happens with the Fourth Circuit determination before this Court would rule. This is a different topic, but why, when you wanted to challenge the STB order, did you not challenge it in the Fourth Circuit? Why did we not bring a petition for review that is in the Fourth Circuit? Do we have some kind of exclusive jurisdiction? I don't think so. I'm just kind of wondering why this case – let's assume that you have jurisdiction to challenge the STB order under the theory that you assert. Why is this the right place to do that instead of the Fourth Circuit? I believe at the time – I would have to go – let me check my notes on that and get back to you on that during rebuttal. We did have a particular reason for coming to this Court rather than the Fourth Circuit. I want to ask you a follow-up question on the jurisdiction. Sure. Why doesn't McCarty Farms decide this? I mean, we may just agree to hold it in abeyance, but I don't see any problem with our jurisdiction. The district court referral did not include these 91 and 98 transactions. I agree, Judge Henderson. McCarty Farms does decide this. Under McCarty Farms, this Court adopted what it called, quote, a bright-line rule that made it really easy to determine whether a case goes to the court of appeals or to the district court in this kind of a referral situation. And as the Court said, counsel, you'd only look to the language of the district court's referral order to determine whether the issue was properly reviewable by the court. If the referral expressly mentions a particular issue that goes to the SDV, that would be within the jurisdiction of the district court under 1336. But here, the only issue that was referred by the district court was the question of immunity as a result of the 1982 consolidation. The 91 and 98 issues were not referred, and therefore, under this Court's precedent in McCarty, I don't think there's – I think McCarty does resolve this. There isn't a question that this Court has to resolve. Were they part of the lawsuit in Virginia, the Eastern District, the 91 and 98 transactions? We did not – we raised those issues for the first time before the SDV, not before the district court in Virginia. Okay. And I take it you cannot reapply for this exemption because you're basing it all on the 91 and 98. I mean, you're out of court on the 82 right now on the 91 and 98, right? We are basing it on 91 and 98. I can't tell you that there isn't some other ground out there that we could potentially assert before the SDV, but the arguments that we're asserting in this Court are that as a result of the 91 and 98 transactions that we were authorized to exercise control over Beltline. And the problem with what the SDV did with respect to our 91 and 98 arguments, the corporate family regulation provides a clear and specific and exclusive set of conditions for applying for the corporate family exemption. The transaction has to be within a corporate family, and it can't result in any of three things – adverse changes in service levels, adverse significant operational changes, or a change in the competitive balance. The SDV added a fourth requirement. It added a prior authorization requirement that, quote, the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family. That prior authorization requirement simply does not appear on the face of the regulation. It's something that the SDV added improperly in this proceeding, and adding a condition to a clear and express and exclusive regulation is categorically arbitrary and capricious. The prior authorization requirement is also superfluous given the other provisions of the regulation. The regulation includes a competitive balance requirement. It allows other parties to intervene in the proceeding if they have an objection to the transaction. It allows the SDV at any time to revoke an exemption if it determines that that's necessary. And so the regulation contains a structure that already accounts for whatever additional concerns the board had when it impermissibly read this extra textual competitive balance requirement into the regulation. The other thing I'd emphasize, Norfolk Southern's control over Beltline was no secret heading into the 91 and 98 transactions. When did they get control? I'm sorry? When did they get control? We believe that we obtained control in 1982. But the SDV said that's wrong, and you didn't challenge that here. We believe that we did. The SDV has rejected that argument. In the universe of things that we have the ability to consider, as a court hearing a case where you didn't challenge the 1982 decision by the SDV, when did you get control of Beltline? As a result of the 1991 transaction and the 1998 transaction. And so if that's the case, then I think you're having to suggest that the family exemption would allow Norfolk to get control of something that it didn't previously have control of, right? Well, I think as a practical matter, Norfolk Southern did previously have control over it, and CSX recognized as much. In 1989, CSX and NSC agreed that, quote, CSX will continue to have the right to appoint two representatives of the board. NSC will have the right to appoint a total of three representatives. That was in a 1989 agreement between CSX and NSC. So we had, as a practical matter, the ability to control Beltline heading into the 1991 and 1998 transactions. By the time those corporate family exemptions were filed, Norfolk Southern's control over Beltline was well established. And the exemption proceedings, therefore, didn't change any competitive balance. They didn't change certain... Why do you need the family exemptions in the 90s in order to have the kind of immunity that you're seeking? If you gain control in 1989? Because I think that for purposes of the antitrust immunity, you have to have either express authorization or authorization through the operation of an exemption, which brings us back to where we started our discussion about the importance of the STB's determination for the underlying Fourth Circuit litigation here. If we qualify for the exemption, then we also qualify for the antitrust immunity, which would be relevant to the Eastern District of Virginia case. All right. Thank you. Thank you. Ms. Wilson. Good morning. Good morning, Your Honors. Thank you, Laura Wilson, for the government. May it please the Court, Norfolk Southern's petition for review rests on clear errors, both on jurisdiction and on the merits. On jurisdiction, Norfolk Southern would have this Court bifurcate one legal claim into two different pieces based simply on the timing of the company's associated arguments. That outcome would be contradictory to the arising out of standard in the statute, Section 1336B, and would also be inconsistent with this Court's decision in McCarty Farms and all other applicable case law. On the merits, Norfolk Southern proposes to use a class exemption for a ministerial transaction and to somehow transform that into authorization to have acquired control over a railroad. That result, too, is directly contradictory to express provisions of the Interstate Commerce Act. Give us some insight on why we shouldn't dismiss this because there's no current Article III injury to Norfolk Southern. Certainly, Norfolk Southern has fled its case on the basis of its injury in the antitrust litigation. If that case were to go away, there might be ramifications down the line for Norfolk Southern not having authorization to control the Beltline. So I can't say there is completely no possibility for remaining injury, but certainly that is relatively remote relative to the injury in the antitrust litigation. I should note that in the Board's decision below, it left open future control over the Beltline. It said that once the antitrust litigation is complete, the party should come back to secure authorization to control the Beltline. I'm not sure what your position is. If the Fourth Circuit were to affirm the district court, do you think Norfolk Southern has standing in this court? Yes, I would conclude they do. I think it's important, though, Your Honors, to dismiss this case on grounds of lack of jurisdiction, not for reasons of standing, but for the proper application of Section 1336B. But didn't McCarty Farms, didn't we say, look, we need a very clear, concrete rule? We cited Judge Ross' dissent from the Third Circuit that said, look, parties will be able to know whether they can file a petition in the Court of Appeals because all they have to look is at kind of the four corners of the referral. And if, you know, the issue doesn't appear explicitly within those four corners, then it doesn't fall within this narrow exception where there's jurisdiction in the district court, jurisdiction under the Hobbs Act falls in the Court of Appeals. That's a very simple, clear, discreet, bright-line rule. Applying that, why isn't there jurisdiction here? What the court did in McCarty Farms and is reflected in the other cases in the other circuits under Section 1336B is to draw a bright line around issues at the level of claims, broad causes of action. Here, the cause of action, there's one claim at issue here, one cause of action, and it's Norfolk Southland's claim of immunity in the antitrust litigation. That was the basis for the district court's referral. Reading the referral order as a whole, it's clear that that is the issue that the court wanted the board to resolve. The court referred what the referral began with a reference to the 1982 consolidation. I mean, it reads, did the 1982 consolidation, et cetera, et cetera, involve the ICC STB granting NSC approval to control Beltline? So that was the issue. The issue was framed relating to the 1982 consolidation, and the district court couldn't have been referring to the 91 or 98 proceedings because, as your friend on the other side just said, they didn't utter a word about them in the district court. They didn't come up until it got to the STB. So how is that part of the issue that was referred if the district court didn't even know that that was going to be an issue? Again, I would submit, Your Honor, that the district court's intention was clearly to submit to the board the issue of immunity, to get the board's guidance on whether the district court needed to dismiss the antitrust claims on the basis of immunity. The board could not provide that guidance to the district court once Norfolk Southern did raise the question of the 91 and 98 exemptions. The board could not provide reasonable, meaningful guidance to the district court without addressing the effect of those exemptions. So I would note that there's somewhat of an irrationality, respectively, in Norfolk Southern's claim that all the district court cared about was the immunity of Norfolk Southern Corporation, the holding company. I mean, that's after all, the holding company was the applicant in 1982. That's why the question was framed in the district court's referral with respect to Norfolk Southern Corporation, the holding company. But it was Norfolk Southern Railway, the operating company that was seeking to rely on that same immunity to get out of the antitrust litigation. And so for Norfolk Southern to suggest, well, there's really two different issues here, one the immunity of the holding company and one the immunity of the operating railroad, I don't think holds together. I can go on to express other reasons, if you care to, on why I believe that McCarty Farms is consistent with our proposed outcome in this case. I think critically, in this case, the board's decision and review affects the antitrust litigation. And Congress's intent was to leave a single claim before the district court in which that claim originated. In McCarty Farms, notably, there were new claims that were introduced to the board, claims that the resolution of which had no effect on the district court litigation. So there, by asserting jurisdiction, this court left in place the district court's ability to reach a final judgment on the case before it, without potentially making that district court wait. And it's on that basis, for that reason, that Congress enacted Section 1336B. I know you think that this case shouldn't be in any circuit court at this point, but do you know why it's here and not the Fourth Circuit? I think that's an excellent question, Your Honor. There is no precedent in the Fourth Circuit that would have compelled the district court here to dismiss the challenge by Norfolk Southern. So why we are in particular in this court seems to be based on McCarty Farms. It seems to suggest a split between the circuits on this issue, which I would submit is not helpful for purposes of implementing Section 1336B. But again, I think properly understood, this court's decision in McCarty Farms is consistent with the court dismissing this petition for review for lack of jurisdiction. Supposing we disagree and believe that we have jurisdiction and reach the merits, do you have anything you want to say on the merits in defense of the board's decision? Absolutely, Your Honor. I think to begin, it's important to underscore that Norfolk Southern obtained de facto control over the Beltline before 1991. What year that happened in particular, we don't know because the matter was never presented to the board for authorization. So come 1991, the corporate family, now de facto controlling the Beltline, undertakes an internal reorganization. It reshuffles the pieces and it comes in for an exemption from regulatory review. It says this is a non-event for regulatory purposes. We're just changing around our ownership interests, nominal ownership interests within the corporate family. That kind of transaction qualifies for a class exemption precisely because it doesn't raise regulatory concerns. So for Norfolk Southern to argue that, well, that exemption from regulatory review somehow made up for its prior unauthorized acquisition of control doesn't hold together. There is still a critical missing piece, which is that Norfolk Southern has never come to the board to demonstrate that it meets the applicable standards, the standards that apply to an acquisition of control over a railroad. Without having made that demonstration, Norfolk Southern cannot lawfully claim control authority. That is the essence of the board's decision, that it would nullify the regulatory regime to treat the class exemptions for these internal reorganizations as somehow curing that unauthorized acquisition of control, simply because in those circumstances the company would never demonstrate that it met applicable standards. It did not take great length for the board to explain that position and to dismiss what was effectively just a tag-on argument by Norfolk Southern in its petition to the declaratory order. And to be honest, I don't think it's more complicated than that. I should, I guess, address this question about a new rule. Did the board impose a new rule in this decision? Absolutely not. The requirement for authorization of that prior acquisition stems from the statute. I mean, it's a clear, undisputed requirement of the statute to have obtained regulatory authorization for that prior acquisition of control. All right. If there are no questions, thank you. Thank you, Your Honor. Mr. Hatch. Good morning. Before you start your argument, you don't have much time. That district court order of over 100 pages, can you just tell us what the breach of contract resolution was? Yes, Your Honor. Thank you. Ben Hatch on behalf of CSX. You know, the monolith in the railroad business is bringing an antitrust suit just seems like a contradiction in terms to me. But if you'll just tell me about the breach of contract resolution. Yes, Your Honor. Thank you. May it please the court. Presently, the state of proceedings in the district court is that there has been a final judgment entered on the 19th of last month. And Judge Wilkins, I think you asked, and we will be appealing the district court's rulings. And collectively, there was a series of rulings, Judge Henderson, starting at the summary judgment stage and then subsequent rulings on injunctive relief. And really, on the breach of contract claim, there's two aspects, both the damages and the injunctive relief. But presently, both of those have been dismissed and there's final judgment from which we will be appealing. And we certainly view the conduct as a breach of contract. That's what I want to know. In what respect? In what respect? Well, the Beltline was formed originally as a cooperative agreement among eight railroads long ago. And each one of them had one board seat and they would cooperate in the operation of that railroad to access the points along the railroad. And you bring that forward to today and there was consolidation, of course. And now there's the two owners of the Beltline, Norfolk Southern, which has about 57%, CSX, 43%. But all those agreements are still in place. That is, the core of the Beltline, and Chief Judge Davis has opined on that in opinions at various points in the litigation, that there's a purpose of the Beltline that is not the purpose to serve as a subsidiary of one of its owners. It's a purpose to share in the common. And so the Norfolk International Terminals, which is a major East Coast port facility in Virginia, is connected by the Beltline. Norfolk Southern has its own track to get into the Norfolk International Terminals. CSX would utilize the Beltline. And the core of our case is that they have, through their own conduct and through conspiracy with the Beltline, raised the rates and taken other actions to stop CSX from accessing NIT, and as a result have an effective monopoly on the traffic through NIT. So that is certainly... Are the rates confiscatory? Is that your claim? Is CSX saying we can't pay the rates or we don't want to pay the rates? Or that they shouldn't impose rates? That's all I'm trying to find out. Why this is more than a breach of contract. Well, certainly it is a breach of contract in our view, Your Honor. We'll be appealing that. But the issue is, our view is that they raise the rates to unreasonably high levels to where it's preclusive of our ability. You could literally pay the rate, but as a competitive matter, it's preclusive of being able to compete because they're so high. And I think it's very significant in the case that we proposed at various points in time a lower rate for that service, and the Beltline always assessed that it would make profit on the lower rate, and yet they never reduced it. And is this a rate that charged only CSX? Well, they have a... This would be a rate under the proposals we make that would be for access to NIT. If Norfolk Southern wanted to use them, they would charge Norfolk Southern that. But as a practical matter, I don't think anybody disagrees Norfolk Southern would utilize its own track. Okay, thank you. So effectively, it would be for CSX. Your Honor... Are there other rail carriers that could use Beltline other than CSX? At Norfolk Southern? There are, in theory, Your Honor. And I think perhaps others have for not this type of service to NIT, but for some other business. It's a very small part, in my understanding, of the Beltline's business historically. Other rail carriers as primary customers, at least in recent history, relevant to the case of Norfolk Southern and CSX. All right. Thank you. I did want to address... Counsel for Norfolk Southern started with the premise that it's established that we agreed to their control of the Beltline in 1989. And I just want to say our position below on that, there was not discovery in this proceeding. The proceedings were readily limited to the agency records. And that's because it only matters for the referred question if the STD granted them lawful control. Because only through that grant could they get immunity. Their proposition is that they get immunity from federal and state law. So this would be as to all claims, even though they never applied to control the Beltline and the STD never gave them that authority. And, of course, you could have discovery on what the history was, but the only thing that matters is what the STD granted. So our position below is it's irrelevant what that history was. We don't need discovery on it because you can decide it on the agency record. But I would just say it's not agreed that we agreed to their control in 89 at a time when we know from 82 they did not have control. They reshuffled the board. But having three seats versus two does not equal control under the law. And Chief Judge Davis addressed that as well as an open question in his referral order. But the bottom line is it doesn't matter what the parties did. It matters what the STD did. And the STD was never presented with a request by them to control the Beltline. And it never granted that authorization. And I think it would be a very—and that's what the STD said in its decision, and it's certainly not arbitrary and capricious. I think it would be a very dangerous precedent if railroads could gain immunity from all forms of law without submitting that question to their regulator for appropriate review and approval. All right. Thank you. I see my time has expired. Thank you, Your Honor. Just a few quick points in rebuttal. Judge Walker, to go back to your question about why this court—I think this is a Bendew question. Under 2343, we could have gone either here or to where the petitioner resides or has its principal office. In 2020, Norfolk Southern moved its headquarters to Atlanta, so it would have been either here or the 11th Circuit rather than the 4th Circuit. And as between the D.C. Circuit and the 11th Circuit, the D.C. Circuit has the McCarty Farms precedent, which settles the jurisdictional question. This court obviously also has experience reviewing agency action, and so it just would make more sense for this case to be litigated here. With respect to the injury point, I understand now, based on Mr. Hatch's representation, that the district court's decision will be appealed. We certainly would be pleased to provide either status updates or, at an appropriate time, supplemental briefing on the injury point, if the court thought that appropriate. On the McCarty Farms point, McCarty Farms' bright-line rule is clear at 1300. Issues expressly set out in the district court's referral order are reviewed by the district court. The Court of Appeals reviews all other issues. That bright-line rule doesn't turn on any particular factual distinctions between McCarty Farms. In this case, it is, by its nature, a bright-line rule. And then lastly, as to the merits, both the STB and CSX have made arguments in their briefing and here today that somehow recognizing that Norfolk Southern controlled Beltline through the 91 and 98 transactions would somehow nullify the statutory scheme, the regulatory scheme. To the contrary, we are simply complying with the corporate family exemption. The arguments that the STB has made to justify denying us that exemption in this court now are post hoc rationalizations not supported by the face of the exemption. If the STB believes that the exemption sweeps too broadly and allows an exemption in circumstances like these, it's, of course, free to revise the regulation, but it would have to do that going forward. It can't do that through this declaratory order where it is bound by the regulation that it promulgated. All right. Thank you. Thank you.
judges: Henderson, Wilkins, Walker